In re PHELPS, Collector of Customs.

(Circuit Court, N. D. California. November 28, 1892.)

CUSTOMS DUTIES—CLASSIFICATION—SUMATRA TOBACCO—CIGAR WRAPPERS.

On a question whether certain importations of unstemmed Sumatra tobacco were suitable for cigar wrappers, and therefore dutiable at two dollars per pound under the tariff act of October 1, 1890, (Schedule F, par. 242,) there was an irreconcilable conflict between the witnesses for the importer and those for the government, the former claiming that the tobacco was too brittle for wrappers; but it appeared that a large part of the importation had already been sold for wrappers at $2.65 per pound, while its value for fillers could not exceed $1 or $1.25 per pound, and that it had been made into cigars, and sold to the trade. Pending the cause, cigars were made from samples of the tobacco, and were apparently of good quality, and had not deteriorated by drying during the course of five months. *Held*, that the tobacco was dutiable at $2 per pound.

Application of Timothy G. Phelps, collector of customs for the port of San Francisco, Cal., for a review of the questions of law and fact involved in the decision of the board of general appraisers on duty at the port of New York on the 19th day of December, 1891, in respect to the classification of 146 bales of leaf tobacco, imported by

Liebes Bros. into the port of San Francisco in bond from Hamburg, Germany, by way of the port of New Orleans. Reversed.

Charles A. Garter, U. S. Atty., and Charles A. Shurtleff, Asst. U. S. Atty., for petitioner.

Henry C. Dibble, for respondents.

McKENNA, Circuit Judge. This is an application and proceeding under section 15 of the act of June 10, 1890, entitled "An act to simplify the laws in relation to the collection of the revenue," to review the decision of the board of general appraisers determining the classification of certain Sumatra tobacco imported into this port by Liebes Bros. The law in regard to the classification and duty on tobacco is as follows: Sections 242 and 243 are as follows:

"Sec. 242. Leaf tobacco, suitable for cigar wrappers, if not stemmed, two dollars per pound; if stemmed, two dollars and seventy-five cents per pound: provided, that if any portion of any tobacco imported in any bale, box, or package, or in bulk, shall be suitable for cigar wrappers, the entire quantity of tobacco contained in such bale, box, or package, or bulk shall be dutiable, if not stemmed, at two dollars per pound; if stemmed, at two dollars and seventy-five cents per pound.

"Sec. 243. All other tobacco in leaf, unmanufactured, and not stemmed, thirty-five cents per pound; if stemmed, fifty cents per pound."

There were 478 bales imported, of which two entries were made. The 146 bales involved in this appeal were entered on the day of the arrival of the tobacco at 35 cents a pound, and the board says were so passed on September 23d, by the appraiser, after an examination of each bale; on what kind of an examination we shall see hereafter. The board further says the peculiarity of the importation of Sumatra tobacco for fillers attracted public comment, and resulted in protests against such classification. A re-examination followed, and a reappraisement was made on September 26th, and the tobacco classified as suitable for wrappers, and dutiable at $2 a pound. One day, after the appraiser's original classification, and before the change of it, Liebes Bros. entered the rest of the tobacco, to wit, 322 bales, as also unsuitable for wrappers, and dutiable at 35 cents. It was classified, however, as dutiable at $2. The importers protested, and the protests were referred to the board of general appraisers for decision. The board reversed the collector as to the classification of the 146 bales, and affirmed his action as to the rest of the tobacco. Its decision as to the 146 bales is brought to this court for review.

The law makes the record in this court to consist of the evidence taken before the board of appraisers and such further evidence as may be offered by the parties, and it is therefore manifest that the aspects of the case may be changed here from those presented to the board of appraisers. Indeed, the only investigation has been here. The examination of the tobacco was by samples from the bales, not of the bales themselves, and its original classification at 35 cents, and its reclassification at $2, and the decision of the board of appraisers, were all made on the same samples. They were assumed to be true by the customs officers and by the board of appraisers. Here they are challenged, and the new testimony which has been taken

is directed in part to their impeachment, and, though not entirely satisfactory, there is much strength in it. When the 146 bales were entered at the customhouse, 15 bales—10 per cent. of the invoice— were selected for examination. It is obvious that, if taken without special selection, they would have represented the whole invoice. By whom they were selected, or in what way selected, does not appear. On this the record is silent. All of these 15 bales were opened by Mr. Tucker, who was assistant appraiser. "Finding them," as he testifies, "all small, and in bad condition," he told the appraiser he desired the whole invoice for examination. It may be said, if the invoice had been examined, many aspects of this controversy would be different, if there would be any controversy at all. The appraiser replied to the request that he did not think it necessary to send up the whole invoice, but he would send an examiner to take samples of the balance, and he ordered Examiner Hollywood to do so; and Mr. Tucker further testifies that he saw the samples which Mr. Hollywood returned, but whether they were like or unlike those drawn by himself he does not state, and Mr. Hollywood is not called as a witness. The testimony, however, shows that 131 bales of the tobacco were stored by Liebes Bros. in the California warehouse, and that Hollywood, or some customhouse officer, and one of the Liebes and another man, drew samples from those bales. Neither of the latter is called to testify. But S. H. Noble, manager of the warehouse, and Edward Gallagher, the porter, were called as witnesses. They saw the samples drawn, and, while their observation of them was to some extent casual, and as they lay in piles on the floor of the warehouse, the witnesses are quite positive that they were not like the samples exhibited to them, and on which we have seen the decisions of the collector and board of appraisers were made. Gallagher was quite emphatic. The Hollywood samples were exhibited to him, and he was asked if he saw any such tobacco as that. He answered: "None at all; nothing like it at all." But it is urged this testimony compares the tobacco at different times,—the time when it was drawn with the time it was returned to this court,—and that there are intimations of a change in its condition. Collector Phelps, in a letter to the board of appraisers, forwarding the protests of the importers, said, "The samples have been handled so much that they do not correctly represent the merchandise;" and the board, in its return to this court, makes this statement: "And there are also hereto annexed samples of the merchandise in question. The samples and exhibits in this case are forwarded in such condition as they are now found, and in the best condition in which they can be forwarded after having been handled by a number of examiners, experts, and other persons, in addition to changes produced by variations in atmospheric conditions." The extent of the changes the board does not state, and what foundation the collector had for his statement does not appear. The board of appraisers assumed, notwithstanding the collector's warning, that the change in the samples which came to it could be seen and allowed for by the witnesses who appeared before it, and the opinion of the witnesses and the board's decision are expressly put on the ground that the tobacco is too short to be suitable for wrappers. This was

the defect in the samples Mr. Tucker drew. The board finds it to be the defect also in the samples Hollywood drew, or rather returned; and this was the difference which Gallagher and Noble testified to between the samples they saw Hollywood draw and the samples returned by him to Tucker, and sent by the board to this court.

The board has sent up 134 hands,—a "hand" being a bunch of leaves. Of these 112 are short, and nearly of a size. Twenty-two are longer, and near of a size. Of the short ones, 10 are samples drawn by Tucker; the rest are samples returned by Hollywood as drawn by him. They are alike now, and, unless handling and "atmospheric conditions" acted unevenly, selecting only the Hollywood samples, they must have been alike when passed on at the customhouse. This time and the time Hollywood returned the samples must be distinguished from the time he drew them, the intimation being that the samples drawn were not the ones returned by him to Mr. Tucker; and it must also be remembered that all the decisions were made on the same samples. But, whether the samples were alike or not, they are unlike those drawn by Mr. McCoy, the government agent.

The investigation before the board of appraisers was not very thorough. The government was not represented at all. The board was notified by the collector that the merchandise had been shipped to New York to be presented to the board by the appellants when the case was called. It was not presented, and the board did not call for it. The board did not seem to think that it was necessary, and based its decision on the samples before it. The government, however, was not satisfied, and started an investigation, detailing an agent by the name of James C. McCoy for that purpose, who had had some experience. He traced to Cincinnati and to several places in New York the total importation of 146 bales. He found 14 of them were composed of short hands and 131 of long hands, and he testified not one of the 131 bales contained tobacco like the samples said to be drawn by Hollywood and exhibited to the board of appraisers. The truthfulness of Mr. McCoy the importers' counsel attacks somewhat in argument, but he is amply corroborated. He found 14 bales of short tobacco. Mr. Tucker says there were 15. The difference is not important. Whether 14 or 15, it is striking proof, and shows that the bales first selected for examination when the goods were entered were unfairly selected, and did not represent the invoice. The board of appraisers, in its decision, calls attention to what it designates as "several unique features in the case." The board, however, did not consider that they overcame the undisputed proof of the quality of the tobacco presented to it, and possibly they did not; but the new evidence adduced here has given these "unique features" importance and strength. The board says:

"Mr. Liebes claimed that the tobacco was imported for fillers and binders. All other witnesses testified that they never knew of any Sumatra tobacco, except cuttings from wrappers, being used as fillers; and there was no testimony to the effect that such tobacco is, or has ever been, used as binders. Various tobacco dealers stated that the price in this country of filler tobacco, equal or superior to the best Sumatra filler, is from 5 to 30 cents a pound. It appears, therefore, incredible that Sumatra tobacco should be imported for any such purpose. In the entry of the tobacco there was also a pecul-

iarity open to unfavorable criticism. The importation of 478 bales arrived in San Francisco on September 16th. Prompt entry was made of a lot of purely filler tobacco. When this was returned by the appraiser as filler tobacco, the remaining 332 bales, containing more than 80 per cent. of wrappers, was entered as fillers. The board is of the opinion that no Sumatra tobacco is imported in good faith as fillers, and every bale of such tobacco so entered should be rigidly scrutinized."

To avoid the possible imputation or suggestiveness of these facts, Mr. Jacob Liebes testified that the firm had instituted some satisfactory experiments with Sumatra tobacco as binders and fillers, and imported the tobacco involved here to continue them. That after its purchase, and before its arrival, they determined to go out of business, on account of the opposition to Chinese labor; hence shipped the tobacco to New York. Mr. Louis Liebes, however, testified before the board of appraisers on November 10th, after the tobacco had been shipped to New York, that his then intention was to use it for fillers and binders; and yet on the 13th day of January, 1892. Mr. McCoy found 42 bales of it in the possession of A. Davis & Co., in Cincinnati, to whom it had been sold for $2.65 a pound as wrapper tobacco. Filler tobacco was then selling at from 5 cents to 50 cents, and, if Sumatra was cheaper at a higher price, the highest price fixed by the testimony was $1 or $1.25 a pound. Mr. Liebes got $2.65 a pound. This evidence is attempted to be depreciated by showing that time was given for payment, but stronger testimony of the opinion of the importers themselves of the quality of the tobacco could hardly be adduced, and no injustice will be done to them if the government treat it in dealing with them as they treated it in dealing with buyers from them. It was said in the argument that the rest of the tobacco was sold, but at what prices, or for what purpose, was not disclosed. If for a different purpose, or at a lower price, than that sold in Cincinnati, it would seem natural for the importers to explain. It is not meant to be said that after an article has been properly imported it may not be sold at any price; but if the article is in controversy, what it sells for is some evidence of what it is, and strong evidence, in the absence of testimony showing a demand so eager that it disregards differences in its quality.

There are other circumstances in the case which at least evince a disposition to concealment by the importers. The tobacco was imported into California via New Orleans, and was sent to New York from here, incurring an expense which, if the tobacco was filler, and to be sold as filler, they could not have hoped to have reimbursed. On 60 of the bales the invoice numbers were changed, confusing their identity, and there was also an attempt to destroy the coverings on some of the bales. Meager information was given to inquiries made of the members of the firm in San Francisco and the principal member of the firm in New York, Mr. Louis Liebes, and the one who bought and imported the tobacco; was reported not in to the government agent, when he was in; and at a subsequent time, while not denying his identity, refused to admit it. They shipped the tobacco from San Francisco to New York, but did not exhibit it to the board of appraisers, and have acted throughout as if the government was entitled to no disclosures or assistance from them, and have risked inferences against

them—may be, imputations against them—which it would seem they would have tried to avoid if it had been possible to have avoided them, trusting to the ingenuity of counsel to make excuses, rather than evidence which would have superseded excuses.

But the chief inquiry is as to the character of the tobacco represented by the samples drawn by Mr. McCoy, the government agent. He drew samples from all of the bales, and there is no doubt that they correctly represent the tobacco. There is a marked contrast between them and the samples exhibited to the board of appraisers, or passed on at the customhouse; the contrast is too great, it seems to me, to be accounted for by difference in handling. But, whether so accounted for or not, it is unimportant to dwell on now. That has been considered. Care did not make them representatives of the bales from which they were drawn; it only preserved them as true representatives, and therefore better evidence than those which come discredited by imputations of changes caused by handling or atmospheric conditions. A great deal of expert testimony has been taken on the question of their quality, which is very conflicting, but there are circumstances which help a discrimination. The witnesses for the government are very sure that the tobacco is suitable for wrappers; the witnesses for the importers are very sure that it is not, giving reasons therefor. One of the reasons given was that it was too brittle. Some thought that it was so brittle that it would not even endure wetting, and all thought it could not be rolled around a cigar. Experiments showed that neither reason was good. It was made into cigars, and the cigars introduced in evidence. The witnesses then shifted, and the defects in the tobacco which they were sure would prevent a cigar being made at all, they put off the appearance of to another and somewhat indefinite time. They testified that cigars, after they were made, were damp, and it was usual to allow them to remain on shelves a while before boxing. The cigars in this case were boxed immediately after making, and hence boxed damp; and the witnesses were sure—no surer, however, than in the other prediction—that they would be brittle when dry, and that the wrappers would break. This, however, is speculation. It and all the grounds of it are denied by other witnesses of experience and skill. The witnesses who utter it are discredited by failure of other predictions, as confidently uttered. This testimony was given in June. It is now the latter part of November. No brittleness has yet appeared. I examined the cigars on last Saturday, and they, as far as the tenacity of the wrapper is concerned, appear and handle like other cigars. The color of the tobaccco and the cigars made from it is declared to be bad by witnesses for the importers, making them unsalable,—not commercially good. It is enough to say that this testimony is met on all points by counter testimony on behalf of the government, and we have already seen that 42 bales of the tobacco were sold by the importers as wrapper tobacco to a firm in Cincinnati, and it is only necessary to add that it was testified to by the purchasers and other experts as suitable for wrappers, and was made up into cigars and sold to the trade. Certainly the cigars must have been commercially good. Against such practical proof, abstract opinion—disputed abstract opinion, anyway—cannot prevail. Upon

the whole case, therefore, I think that the tobacco involved in this proceeding must be classified as leaf tobacco, unstemmed, suitable for cigar wrappers, and dutiable at two dollars a pound.